1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10  KOFFI KOUAME,                                    CASE NO. C16-1857JLR

11                              Plaintiff,            ORDER GRANTING SUMMARY
                                                      JUDGMENT
12         v.

13  DAL GLOBAL SERVICES, LLC,

14                              Defendant.

15                      **I.    INTRODUCTION**

16         Before the court is Defendant DAL Global Services, LLC's ("DGS") motion for

17  summary judgment.  (*See* MSJ (Dkt. # 26).)  Plaintiff Koffi Kouame filed a response (*see*

18  Resp. (Dkt. # 29)), and DGS filed a reply (*see* Reply (Dkt. # 36)).  The court has

19  considered the parties' submissions in support of and in opposition to the motion, the

20  //

21  //

22  //

1  relevant portions of the record, and the applicable law.  Being fully advised,[1] the court

2  GRANTS the motion and DISMISSES this case with prejudice for the reasons set forth

3  below.

## II.    BACKGROUND

**A.    DGS's Retirement Benefit and Discipline Policy**

6          Mr. Kouame brings an age discrimination case against his former employer, DGS.

7  (*See* Compl. (Dkt. # 1-1) ¶¶ 3.1-3.2 (alleging a claim for age discrimination under RCW

8  49.60.180).)  DGS, a subsidiary of Delta Air Lines, Inc. ("Delta"), provides various

9  aviation services, including aircraft cabin cleaning, to numerous airlines at over 150 U.S.

10  airports.  (Moore Decl. (Dkt. # 28) ¶ 2.)  DGS provides "travel privileges" as its sole

11  retirement benefit to eligible employees.  (*Id.* ¶ 7.)  An employee is eligible for travel

12  privileges if he has worked (a) at least ten years of consecutive service with the company

13  and (b) is 52 years of age or older at the time he retires.  (*Id.* ¶¶ 6-7.)  The travel

14  privileges benefit allows an eligible DGS retiree and his eligible family members (often

15  referred to as "pass riders") to travel "standby" on Delta flights for free or at a reduced

16  rate for the rest of the retiree's life.  (*Id.* ¶ 6.)  Flying standby "necessarily means that

17  pass riders are boarded only if there are available seats after all revenue (or paying)

18  passengers have been boarded.  Consequently, Delta loses no revenue by boarding pass

19  //

20  //

21 ───────────────

        [1] DGS does not request oral argument on its motion (*see* MSJ at 1), and the court
22  determines that oral argument would not be helpful to its disposition of the motion, *see* Local
    Rules W.D. Wash. LCR 7(b)(4).

riders as the seats would otherwise be empty." (*Id.* ¶ 7.) The travel privileges are provided "at no cost to DGS."[2] (*Id.*)

DGS's Employee Handbook lays out the company's disciplinary policy. (*Id.* ¶ 10, Ex. 1 ("Employee Handbook").) The Employee Handbook makes clear that "DGS does not have a progressive discipline process" and that disregarding job responsibilities "can result in disciplinary action up to and including termination." (Employee Handbook at 29-30.)[3] Depending on the nature or severity of the offense, DGS may impose any of the following disciplinary actions: (1) verbal counseling; (2) written warning; (3) final written warning and/or possible suspension; or (4) suspension pending a review for termination. (*Id.* at 30.) The Employee Handbook explains that "[s]ome actions are regarded as so serious by the Company that engaging in them may result in suspension pending disciplinary action or termination of employment." (*Id.*) Three of those enumerated serious actions are "[r]efusing a work assignment," "[s]leeping on the job," and "[l]eaving a work assignment without expressed authorization." (*Id.*)

**B.      Mr. Kouame's Employment and Termination**

DGS hired Mr. Kouame on July 17, 2006, as a Ramp Agent. (Compl. ¶ 2.1; Kouame Decl. (Dkt. # 30) ¶¶ 2-3.) Mr. Kouame was 51 years old at the time. (*See*

---

[2] Mr. Kouame claims that there are, in fact, costs to Delta associated with this travel privilege, including added fuel costs because of more weight on the plane and added administrative costs of processing retirees and pass riders. (*See* Resp. at 3.) Mr. Kouame cites no evidence for these propositions, instead claiming that these are generally known facts within the scope of Fed. R. Evid. 201. The court notes, however, that Mr. Kouame makes no allegation that these costs affect DGS specifically. (*See* Resp. at 3.)

[3] When referring to exhibits in the record, the court cites to the page numbers generated by the CM-ECF filing system that appear on the upper right hand of the document.

1  Kouame Decl. ¶ 2.)  On November 30, 2006, DGS issued Mr. Kouame a verbal

2  counseling for not wearing steel-toed shoes in violation of DGS's uniform policy.

3  (Lively Decl. (Dkt. # 27) ¶ 2, Ex. A ("Kouame Dep.") at 14:23-17:21; Lively Decl. ¶ 4,

4  Ex. C (counseling form with Mr. Kouame's signature acknowledging incident).)

5       On February 3, 2015, DGS changed Mr. Kouame's job from Ramp Agent to Cabin

6  Service Agent ("CSA").  (*Id.* ¶ 6.)  CSAs work in teams of four or five to clean and

7  service aircrafts between flights and aircrafts remaining overnight.  (Moore Decl.  ¶¶ 3-

8  4.)  The team's "Lead Agent" issues assignments to CSAs throughout their shifts.  (*Id.*

9  ¶ 4.)  "CSAs are required to finish all of their assignments even when doing so causes

10  them to work beyond their scheduled shift."  (*Id.* ¶ 5.)

11       Shortly after Mr. Kouame began working as a CSA, on April 18, 2015, he was

12  issued a final warning when the Station Manager, Flordia Moore, observed him sleeping

13  in the team van during a shift.  (*Id.* ¶ 11; *see also id.* ¶ 13, Ex. 3 ("Final Warning

14  Letter").)  Mr. Kouame disputes that he was asleep during this incident (Resp. at 4-7) and

15  that, regardless, he was entitled to be asleep at the time because he was on his lunch

16  break (*see id.*).  Mr. Kouame does not dispute, however, that DGS cited him for this

17  incident.  (*See id.*; *see also* Final Warning Letter; Kouame Decl. ¶¶ 7-10.)  DGS

18  immediately suspended Mr. Kouame for this episode and provided him with a Final

19  Warning Letter.  (Kouame Decl. ¶ 8; Final Warning Letter.)  The Final Warning Letter,

20  dated May 1, 2015, advised Mr. Kouame:

21       Based on your poor job performance, you are being placed on Final Warning.
        It is imperative that you understand the seriousness of your situation and take
22       immediate steps to improve your overall job performance.  Any additional

problems in this area, or any infraction of Company policy or failure to meet Company standards, will likely result in the termination of your employment.

(Final Warning Letter.) Mr. Kouame attests that he was not provided a copy of the Final Warning letter, nor was he advised that it was, in fact, a Final Warning Letter. (Kouame Decl. ¶ 10.) Mr. Kouame acknowledges, however, that he reviewed the letter (*see id.*), and the letter expressly says that Mr. Kouame was "being placed on Final Warning" and was titled "**SUBJECT:** Final Warning Letter." (*See* Final Warning Letter (emphasis in original).) DGS allowed Mr. Kouame to return to work on May 13, 2015. (Kouame Decl. ¶ 10.) At this time, Mr. Kouame was about one year away from being eligible to retire with travel privileges. (*See id.* ¶ 3.) Upon returning to work, Mr. Kouame asked his managers about the possibility of early retirement, and they explained that early retirement was not allowed. (*Id.* ¶ 11.) Mr. Kouame then expressed his intent to retire as soon as he was eligible to several managers. (*Id.*)

At 6:45 a.m. on August 29, 2015, when Mr. Kouame was nearing the end of his 10:30 p.m. to 7:00 a.m. shift, his team's Lead Agent, Clara Cabrera, instructed the entire team to service another aircraft. (*Id.* ¶ 12.) When the team arrived at the assigned gate, no plane was there. (*Id.*) After the plane did not arrive for another ten minutes, the team told Ms. Cabrera to contact the dispatcher. (*Id.*) The dispatcher—who gives the Lead Agent the team assignments (Moore Decl. ¶ 4)—told Ms. Cabrera to have her team assist another team (Kouame Decl. ¶ 12; Kouame Dep. 42:2-4). According to Mr. Kouame, Ms. Cabrera attempted to find out how far along the other team was on its assignment, but she was unsuccessful. (Kouame Decl. ¶ 12.) Mr. Kouame claims that Ms. Cabrera

then instructed the team to "go to the break room and clean the van." (*Id.*) It was "well after 7:00 a.m." when Mr. Kouame and his team finished cleaning the van. (*Id.*) Mr. Kouame claims that it was the entire team's understanding that Ms. Cabrera's instruction meant that after cleaning the van, the team should go home (*id.*), even though Mr. Kouame acknowledges that he was never expressly excused from helping the other team. (Kouame Dep. 43:11-13.) When the van was clean, Mr. Kouame and the rest of his team clocked out and left. (Kouame Decl. ¶ 12.)

DGS investigated the incident, soliciting statements from Ms. Cabrera and each team member involved. (Moore Decl. ¶ 15, Ex. 4 ("Team Statements").) Following its investigation, DGS determined that "all four team members failed to complete a work assignment from their Lead and left work without permission—both violations of DGS'[s] written policies." (Moore Decl. ¶ 16.) In deciding what discipline to impose, DGS claims that it reviewed and considered each team member's disciplinary history. (*Id.* ¶ 17.) Eduardo Romero (then age 57) was given a verbal counseling because he had no prior discipline history. (*Id.* ¶¶ 14, 18, Ex. 5.) Abebaw Gobezie (then age 46) was issued a warning letter because he had only a prior verbal counseling. (*Id.* ¶¶ 14, 18, Ex. 6.) Mr. Kouame and Jeffrey Ruguian (then age 34), however, were both terminated. (*Id.* ¶¶ 14, 19-20, Exs. 7-8.) DGS claims it terminated Mr. Kouame and Mr. Ruguian because each were on a final written warning at the time of the incident. (*Id.* ¶ 19.) The formal termination recommendations for both Mr. Kouame and Mr. Ruguian, issued September 3, 2015, explain that the "[t]riggering incident was the same for both." (*Id.* ¶ 20, Ex. 7 at //

1  2-3.) Mr. Kouame was 60 years old when he was terminated and less than a year away

2  from being eligible to retire with travel privileges. (Compl. ¶ 2.3.)

3      Mr. Kouame alleges that when he gave his statement to DGS on August 31, 2015,

4  Ms. Moore explained to him that he was being fired because he "led the team to go home

5  and not follow the instruction." (Koumae Decl. ¶ 14.) Mr. Kouame claims that Ms.

6  Moore is incorrect and that he did not lead the team to go home. (*Id.*) According to Mr.

7  Kouame, when he gave his statement to Ms. Moore, DGS did not tell him that other team

8  members were being disciplined for the incident. (*Id.*) Later that day, Mr. Kouame

9  called the DGS Human Resources ("HR") office and issued a complaint alleging that his

10  termination constituted unlawful discrimination. (*Id.* ¶ 15.) All team members received

11  their formal discipline notices after Mr. Kouame issued his complaint with the HR office.

12  (*See* Resp. at 9-11; Moore Decl ¶¶ 18-20, Exs. 5-8.)

13      Mr. Kouame alleges that on September 17, 2015, he faxed a written internal

14  appeal to the DGS HR office at the fax number provided by a DGS manager, claiming

15  that he was discriminated against. (Kouame Decl. ¶ 16, Ex. B at 2.) Mr. Kouame never

16  received a response from DGS regarding his appeal. (*Id.* ¶ 17.) He therefore contacted

17  the Equal Employment Opportunity Commission ("EEOC") about making a

18  discrimination complaint. (*Id.*) On October 15, 2015, the EEOC sent Mr. Kouame a

19  Notice of Charge of Discrimination form, citing national origin and age as the basis for

20  Mr. Kouame's claimed discrimination. (Wotipka Decl. (Dkt. # 32) ¶ 10, Ex. 9 (Dkt.

21  # 32-9) at 2.)

22  //

1    Mr. Kouame then filed the present lawsuit alleging that, by terminating him, DGS

2  discriminated against him based on his age in violation of the Washington Law Against

3  Discrimination ("WLAD"), RCW 49.60.180.  (Compl. ¶ 3.1.)  Mr. Kouame seeks

4  damages and attorney's fees and costs.  (*Id.* ¶¶ 3.1-3.2.)  DGS's instant motion for

5  summary judgment argues that Mr. Kouame has failed to state a *prima facie* case of age

6  discrimination and, in addition, Mr. Kouame has not provided sufficient evidence that his

7  termination was pretextual.  The court now addresses whether DGS is entitled to

8  summary judgment on Mr. Kouame's age discrimination claim.

9                          **III.    DISCUSSION**

10  **A.    Legal Standard**

11        Summary judgment is appropriate if the evidence, when viewed in the light most

12  favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to

13  any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

14  P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*,

15  477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing

16  there is no genuine issue of material fact and that he or she is entitled to prevail as a

17  matter of law. *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden,

18  then the nonmoving party "must make a showing sufficient to establish a genuine dispute

19  of material fact regarding the existence of the essential elements of his case that he must

20  prove at trial" in order to withstand summary judgment.  *Galen*, 477 F.3d at 658.  A fact

21  is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*,

22  477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient

1 │ evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods.,*

2 │ *Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

3 │       In determining whether the fact-finder could reasonably find in the nonmoving

4 │ party's favor, "the court must draw all reasonable inferences in favor of the nonmoving

5 │ party, and it may not make credibility determinations or weigh the evidence." *Reeves v.*

6 │ *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Nevertheless, the

7 │ nonmoving party "must do more than simply show that there is some metaphysical doubt

8 │ as to the material facts . . . . Where the record taken as a whole could not lead a rational

9 │ trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v.*

10 │ *Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting *Matsushita*

11 │ *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

12 │       The court may only consider admissible evidence when ruling on a motion for

13 │ summary judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773-75 (9th Cir. 2002).

14 │ "Conclusory allegations unsupported by factual data cannot defeat summary judgment."

15 │ *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003).

16 │ **B.    Washington Law Against Discrimination, RCW 49.60.180**

17 │       Mr. Kouame alleges that DGS violated the WLAD by terminating his employment

18 │ on the basis of age. (Compl. ¶¶ 3.1-3.2); RCW 49.60.180. Under the WLAD, an

19 │ employer may not "discharge or bar any person from employment because of age."

20 │ RCW 49.60.180(2). In analyzing claims under the WLAD, Washington courts look to

21 │ federal courts for interpretation and use the *McDonnell Douglas* burden-shifting analysis

22 │ used to assess Title VII claims. *See Duplessis v. Golden State Foods*, No. C06-5631RJB,

1   at *3 (W.D. Wash. Apr. 16, 2007) (citing *Hill v. BCTI Income Fund-I*, 23 P.3d 440, 445-

2   46 (Wash. 2001)). The *McDonnell Douglas* analysis has three components. *See*

3   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). First, the plaintiff

4   must present a *prima facie* case of discrimination. *Id.* at 802. Second, if the plaintiff

5   succeeds in presenting a *prima facie* case, there is rebuttable presumption of

6   discrimination and the burden of production shifts to the employer to produce a

7   legitimate, nondiscriminatory reason for the adverse employment action. *Robinson v.*

8   *Pierce Cty.*, 539 F. Supp. 2d 1316, 1326 (W.D. Wash. 2008) (citing *McDonnell Douglas*,

9   411 U.S. at 802). And third, if the employer presents a legitimate, nondiscriminatory

10  reason for the adverse action, the burden shifts back to the plaintiff to show that the

11  employer's reason is merely pretext for unlawful discrimination. *See McDonnell*

12  *Douglas*, 411 U.S. at 804.

13      An employer is entitled to summary judgment if the plaintiff cannot present

14  sufficient evidence to create a genuine issue of material fact that the employer's stated

15  reasons are pretextual. *Robinson*, 539 F. Supp. 2d at 1326. "Summary judgment to an

16  employer is seldom appropriate in the WLAD cases because of the difficulty of proving a

17  discriminatory motivation." *Scrivener v. Clark Coll.*, 334 P.3d 541, 545 (Wash. 2014).

18  "To overcome summary judgment, a plaintiff only needs to show that a reasonable jury

19  could find that the plaintiff's protected trait was a substantial factor motivating the

20  employer's adverse actions." *Id.* Washington courts describe a plaintiff's burden at this

21  stage as one of "production, not persuasion," which may be proved through direct or

22  circumstantial evidence. *Id.* But where "the plaintiff has produced no evidence from

1    which a reasonable jury could infer that an employer's decision was motivated by an

2    intent to discriminate, summary judgment is entirely proper." *Kuyper v. State*, 904 P.2d

3    793, 797 (Wash. Ct. App. 1995).

4         1. *Prima Facie* Age Discrimination Case

5         To establish a *prima facie* case of age discrimination under the WLAD, a plaintiff

6    must show that: (1) he was within a statutorily protected class; (2) he was discharged by

7    the defendant; (3) he was doing satisfactory work; and (4) after his discharge, the position

8    remained open and the employer continued to seek applicants with qualifications similar

9    to the plaintiff. *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cty.*, 404 P.3d 464, 470

10    (Wash. 2017) (citing *McDonnell Douglas*, 411 U.S. at 802). The degree of proof

11    required to establish a *prima facie* case is "minimal and does not even need to rise to the

12    level of a preponderance of evidence." *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d

13    1054, 1062 (9th Cir. 2002). At this stage, Mr. Kouame has satisfied his burden in

14    proving a *prima facie* case of age discrimination.

15         For purposes of the summary judgment motion, the only element of the *prima*

16    *facie* case that DGS contests is whether Mr. Kouame was doing satisfactory work. (*See*

17    MSJ at 9-10.) The evidence shows that Mr. Kouame was disciplined three times in his

18    nine-year tenure with DGS. (*See* Lively Decl. ¶ 4, Ex. C; Final Warning Letter; Moore

19    Decl. ¶ 20, Ex. 7.) Mr. Kouame's first incident involved not wearing the correct shoes,

20    and occurred within six months of starting his employment with DGS. (Lively Decl. ¶ 4,

21    Ex. C.) The second incident occurred eight years later when a DGS supervisor believed

22    that Mr. Kouame was sleeping during his shift. (Moore Decl. ¶ 11.) Mr. Kouame

strongly disputes that he was asleep and, regardless, argues that he was entitled to be asleep because he was on his lunch break. (Resp. at 4-7.) The third incident directly preceded Mr. Kouame's termination. (*See id.,* Ex. 7 at 2.) On this record, and drawing all reasonable inferences in favor of Mr. Kouame, the court finds that there is a genuine dispute of material fact whether Mr. Kouame was doing satisfactory work for DGS.

Three incidents over the course of nine years—with conflicting accounts of one of the incidents—does not strike the court as an indisputably poor performance. *See, e.g., Smith v. Gen. Scanning, Inc.,* 876 F.2d 1315, 1320 (7th Cir. 1989) (considering an employee's long tenure with a company as proof that the employee was performing satisfactory work for purposes of proving a *prima facie* case). At this stage, Mr. Kouame has offered enough to make out a *prima facie* case. DGS's "conflicting evidence of unsatisfactory performance is more relevant to rebutting [Mr. Kouame's] prima facie case, not in proving that no such case exists at all." *Madden v. Indep. Bank*, 771 F. Supp. 1514, 1517 (C.D. Cal. 1991); *cf. Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999) ("[A]llegations of poor performance against plaintiffs discharged from long-held positions may be properly considered, only *after* a prima facie case has been established, when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination.").

DGS does not dispute the other three prongs of Mr. Kouame's *prima facie* case. (*See generally*, MSJ.) The court, therefore, declines to grant DGS summary judgment on the basis that Mr. Kouame has failed to establish a *prima facie* case of age discrimination under the WLAD.

2. Legitimate, Nondiscriminatory Reasons for Termination

DGS asserts that it terminated Mr. Kouame for legitimate, nondiscriminatory reasons, namely, failing to complete a work assignment and leaving a work assignment without authorization. (MSJ at 11.) Mr. Kouame "does not dispute that DGS has satisfied this burden." (Resp. at 15.) The court agrees.

Mr. Kouame admits that he left a work assignment without being excused. (*See* Kouame Dep. 43:1-13 ("Q: So the lead had not excused you from the assignment then; correct? A: Yes.").) According to DGS's Employee Handbook, "[r]efusing a work assignment" and "[l]eaving the work assignment without expressed authorization" are both grounds for discharge. (Employee Handbook at 30.) DGS's stated reasons are legitimate, nondiscriminatory reasons for dismissing an employee. *See Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (listing "inadequate work performance" and "behavior not in accordance with customary business practices" as legitimate, nondiscriminatory reasons for dismissing an employee). The court finds that DGS has met its burden of producing a legitimate, nondiscriminatory reason for dismissing Mr. Kouame.

3. Pretext

The burden therefore shifts back to Mr. Kouame to present sufficient evidence to create a genuine dispute of material fact that DGS's stated reasons for discharge (1) are merely a pretext for discrimination or (2) that although DGS's stated reasons are legitimate, age discrimination nevertheless was a "substantial factor" motivating DGS. *See Scrivener*, 334 P.3d at 546. Mr. Kouame does not need to prove that DGS's sole

1 | motivation was discriminatory, but rather that age discrimination was a substantial factor

2 | in his dismissal. *Id.* Mr. Kouame can meet this burden through either direct or

3 | circumstantial evidence. *Id.* at 545. Mr. Kouame presents a number of arguments to

4 | prove that age played a substantial factor in his dismissal. (*See* Resp. at 16-20.) For

5 | clarity, the court organizes Mr. Kouame's arguments into five categories: (1) DGS began

6 | treating Mr. Kouame badly after he expressed an interest in early retirement; (2) there is

7 | no evidence that DGS discharged Mr. Kouame, or disciplined any of the team members,

8 | for DGS's stated reasons; (3) Mr. Ruguian's recollection of events rebuts DGS's claims;

9 | (4) DGS's failure to respond to Mr. Kouame's internal appeal proves age discrimination,

10 | and (5) DGS's treatment of younger employees shows disparate treatment based on age.

11 | (*See id.*) On the present record, Mr. Kouame has not presented sufficient evidence to

12 | create a genuine dispute of material fact that DGS's articulated reasons were pretext or,

13 | that although DGS's reasons are legitimate, age was nonetheless a substantial factor in

14 | his termination. Thus, DGS is entitled to summary judgment.

15 | First, Mr. Kouame has no direct evidence of DGS's discriminatory intent. Mr.

16 | Kouame is not aware of any DGS policy to terminate older employees, nor is he aware of

17 | a policy to terminate employees before they become eligible for retirement benefits.

18 | (Kouame Dep. at 13:4-24.) Likewise, Mr. Kouame has not heard any DGS manager or

19 | supervisor make negative comments about his age or the age of his co-workers. (*Id.* at

20 | 18:10-20.) In short, there is no direct evidence of DGS's discriminatory intent. (*See*

21 | *generally* Resp.)

22 | //

The court therefore turns to Mr. Kouame's circumstantial evidence. Mr. Kouame first argues that DGS treated him worse after he expressed an intent to retire. (*See* Resp. at 16-17.) In particular, Mr. Kouame alleges that DGS fabricated that he was asleep during a shift in order to lay the groundwork for his dismissal. (*See id.* at 17.) Mr. Kouame, however, misunderstands the timeline. According to his own declaration, Mr. Kouame first expressed to his managers his intent to retire *after* he was accused of sleeping. (Kouame Decl. ¶ 11 ("After being falsely accused of sleeping by Ms. Moore, I asked my managers about [sic] possibility of early retirement, and was told it is not allowed. I expressed my intention to retire as soon as I became eligible to several of my managers.").) DGS disciplining Mr. Kouame with a final written warning because of the sleeping incident therefore could not have been influenced by Mr. Kouame's expressed intent to retire and, more specifically, DGS's discriminatory intent.

Second, Mr. Kouame argues that there is no evidence that DGS discharged Mr. Kouame, or disciplined any of the team members, for DGS's stated reasons. (Resp. at 18-19.) In making this argument, Mr. Kouame cites the team members' personal statements because none of them expressly state that the team "left the job without permission." (*Id.* at 19; Team Statements at 1-4.) On the other hand, none of the personal statements say that the Lead Agent gave permission to leave. (*See* Team Statements at 1-4.) In fact, they all imply that no permission was given. For example, Mr. Ruguian's statement says, "Clara tell [sic] us that we need to help the other team in hanger. But those guys just left after bec[ause] Koffi say he want to go home they have other job." (*Id.* at 2.) Similarly, Mr. Gobezie stated, "Clara went on the phone and was

calling someone; I think it was dispatch, supervisor or someone. After that the time was already after 7 and everyone clock out and go so I just clock out and go too." (*Id.* at 4.) In contrast, the statement from Ms. Cabrera, the team's Lead Agent, implies that she did not give the team permission to leave. (*Id.* at 5 ("I asked [Mr. Ruguian] again: What are you doing? We need to assist Aiysha. He refused and said, no its already time to clock out and Koffi need to go too. They still refused to go and started cleaning out the van.").)

Importantly, an employer's justifications for disciplining an employee do not have to be objectively true. *Villiarimo*, 281 F.3d at 1063. "Rather, courts only require that an employer honestly believed its reason for its actions even if its reason is foolish or trivial or even baseless." *Id.* (internal quotations omitted). Here, DGS has offered evidence that it honestly believed that the team members refused a work assignment and left work without proper authorization. (*See, e.g.*, Team Statements at 5; Moore Decl. ¶¶ 14, 18, 20, Exs. 4-8.) Mr. Kouame does not provide evidence to the contrary.

Mr. Kouame instead crafts an elaborate theory to undermine DGS's evidence: According to Mr. Kouame, DGS disciplined the team members only after Mr. Kouame complained to DGS's HR office on August 31, 2015, in order to cover up its age discrimination against him. (Resp. at 18-20.) In short, Mr. Kouame asks the court to accept that (1) his complaint to DGS's HR office (2) triggered DGS's managers to fabricate emails and evidence about Mr. Kouame's team members' performance and (3) led DGS to formally discipline Mr. Kouame's team members in order to cover its discrimination against Mr. Kouame, including going so far as terminating Mr. Ruguian. (*Id.*) For this elaborate theory, Mr. Kouame relies heavily on the fact that his team

members were not formally disciplined until after Mr. Kouame spoke with DGS's HR office. (*Id.*) Although the court must make reasonable inferences in favor of Mr. Kouame, *see Reeves*, 530 U.S. at 150, the court need not accept "conclusory allegations unsupported by factual data," *Rivera*, 331 F.3d at 1078. Mr. Kouame simply has not provided sufficient evidence for a reasonable factfinder to find in favor of his theory. In fact, Mr. Romero was formally disciplined on September 1, 2015, which is before Mr. Kouame was formally terminated on September 3, thus undermining Mr. Kouame's theory. (*Compare* Moore Decl. ¶ 18, Ex. 5, *with* Moore Decl. ¶ 20, Ex. 7.)

Third, Mr. Kouame claims that Mr. Ruguian's testimony rebuts DGS's stated legitimate reasons, and therefore proves pretext. (*See* Resp. at 19; Ruguian Decl. (Dkt. # 31).) Specifically, Mr. Ruguian claims that the team was given express authorization by a DGS manager to leave the work assignment and that he was told two to three weeks after being terminated that he was fired for too many absences. (Ruguian Decl. at 2.)[4] As discussed below, the court does not find that these statements create a genuine dispute of material fact regarding whether Mr. Kouame's dismissal was the result of discriminatory motivation.

Mr. Ruguian first alleges that a DGS manager authorized the team to leave. (*Compare* Ruguian Decl. at 2 ("The manager there said 'OK' and we left.").) The court notes that none of the team members recounted this authorization in their

---

[4] DGS objects to Mr. Ruguian's recollection of statements made by DGS representatives as improper hearsay under Fed. R. Evid. 801. (*See* Reply at 10 n.8.) The court will consider these statements because they are admissible as an opposing party's statements. *See* Fed R. Evid. 801(d)(2).

near-contemporaneous personal statements. (*See* Team Statements at 1-4.) Nor does Mr.

Kouame remember this express authorization. (*see also* Kouame Dep. 43:1-13 ("Q: So

the lead had not excused you from the assignment then; correct? A: Yes.").) But

crediting Mr. Ruguian's statement as true, the court does not find that it creates a genuine

dispute of material fact regarding pretext. Mr. Ruguian was 34 when he was terminated.

Proof that DGS mistakenly terminated him and Mr. Kouame, but not 57-year-old Mr.

Romero who was retirement-eligible at the time, does not constitute sufficient evidence

of discriminatory intent.

Moreover, as mentioned, DGS only needed to "honestly believe" its legitimate,

nondiscriminatory reasons for terminating Mr. Kouame; the reasons do not have to be

objectively true. *See Villiarimo*, 281 F.3d at 1063. "Central to this inquiry is whether the

decision makers believed in the accuracy of the information they examined at the time

they evaluated whether plaintiff's employment should be terminated." *Fernandez-Ocasio

v. WalMart Puerto Rico Inc.*, 94 F. Supp. 3d 160, 176 (D.P.R. 2015). The DGS

employees responsible for recommending the team members' discipline were Ms. Moore,

DGS's Station Manager, and Chris Nove, DGS's Performance Manager. (Moore Decl.

¶ 16.) Ms. Moore and Mr. Nove made their disciplinary recommendations after

reviewing the team statements, none of which mentioned that Ms. Cabrera gave express

authorization for the team to leave work. (*See id.*; Team Statements at 1-5.) Ms. Moore

and Mr. Nove then forwarded their recommendations to DGS's General Manager, Mark

Murphy, who ultimately agreed to terminate the employees. (*See* Moore Decl. ¶ 20, Exs.

7-8.) The recommendations likewise made no mention of Ms. Cabrera's alleged express

1  authorization. (*See id.*)  Thus, even if Ms. Cabrera had given authorization to leave work,

2  Mr. Kouame has not presented evidence to show that Ms. Moore, Mr. Nove, or Mr.

3  Murphy did not honestly believe that Mr. Kouame and his team refused an assignment

4  and left work without proper authorization. (*See* Resp.)  Mr. Ruguian's later declaration,

5  which DGS's management could not have relied on when deciding discipline, does not

6  create a genuine dispute of material fact regarding DGS's motivation.

7      The same holds true for Mr. Ruguian's statement about being terminated for

8  absences and not the refusal-to-work incident.  DGS detailed in Mr. Ruguian's

9  recommendation for termination letter that he had received discipline for job performance

10  on five occasions, four of which concerned attendance. (*See* Moore Decl. ¶ 20, Ex. 8.)

11  Mr. Ruguian was, in fact, on his final warning letter because of his attendance.  (*Id.*

12  ("11/26/2014 Final Warning Letter regarding attendance").)  The fact that DGS told

13  34-year-old Mr. Ruguian that he was fired in part because of "too many absences" does

14  conflict with DGS's stated explanation for his termination.  Nor does it provide sufficient

15  evidence to create a genuine dispute of material fact that DGS's stated legitimate,

16  nondiscriminatory reasons for terminating Mr. Kouame are mere pretext or that Mr.

17  Kouame's age played a substantial factor in his termination.

18      Fourth, Mr. Kouame claims that DGS's failure to respond his September 17, 2015,

19  internal appeal proves age discrimination. (*See* Resp. at 12-13, 20.)  But Mr. Kouame has

20  not articulated how DGS's failure to respond to his appeal provides evidence of DGS's

21  discriminatory motivation. (*See generally* Resp.)  This evidence is therefore insufficient

22  to create a genuine dispute of material fact to avoid summary judgment.

1  Fifth, Mr. Kouame argues that DGS's treatment of younger employees that are not

2  in line to retire "indicates DGS maintains a different, far more tolerant standard for these

3  employees, for whom it appears almost impossible to be fired absent undisputed, serious

4  misconduct." (Resp. at 20.) There is no evidence, however, to support Mr. Kouame's

5  assertion. Looking first at the incident that preceded Mr. Kouame's firing: Four

6  employees were disciplined for refusing a work assignment and leaving a work

7  assignment without being excused. Of the two employees who were not terminated, one

8  of them, Mr. Romero, was 57 years old and eligible for retirement travel privileges at the

9  time of the incident. (Moore Decl. ¶ 18.) But Mr. Romero was not fired. (*Id.*) Instead,

10  he received a verbal counseling because "he had no prior discipline." (*Id.*) The other

11  employee, Mr. Gobezie, was 46 and received a written letter because he only had a verbal

12  counseling on his disciplinary record. (*Id.*) Conversely, Mr. Kouame and 34-year-old

13  Mr. Ruguian were terminated "because both were on Final Written Warning at the time

14  of the incident." (*Id.* ¶ 19.) If DGS discriminated against its employees based on

15  age—or proximity to retirement benefits which Mr. Kouame appears to use as a proxy for

16  age discrimination (*see* Reply at 3)[5]—DGS would have fired Mr. Romero who was

17  eligible for retirement benefits at the time of the incident. DGS, however, retained Mr.

18

19  _____

20  [5] In its reply brief, DGS argues for the first time that Mr. Kouame does not state a claim
   for age discrimination because "'flight-benefit eligible' is not a protected class." (Reply at 3.)
   The court will not consider this argument. *See Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th

21  Cir. 1990) ("It is well established in this circuit that the general rule is that appellants cannot
   raise a new issue for the first time in their reply briefs.") (internal citations omitted). For the
   purposes of DGS's instant motion, the court construes Mr. Kouame's claim as one for age

22  discrimination.

Romero, choosing instead to discharge the two employees with final written warnings, one of whom was only 34 years old at the time.

Likewise, Mr. Kouame does not explain why—if his age was a substantial factor in his termination—DGS did not discharge him after finding him asleep in a van less than five months before the final incident. Mr. Kouame was 60 in April 2015 when DGS observed him sleeping in the van. (*See* Kouame Decl. ¶ 2 (Mr. Kouame was born on March 10, 1955).) DGS suspended Mr. Kouame for this episode and provided him with a Final Warning Letter, but ultimately reinstated him. (Kouame Decl. ¶¶ 8, 10; Final Warning Letter.) DGS's chosen punishment is noteworthy because "[s]leeping on the job" is an act that qualifies for immediate termination. (*See* Employee Handbook at 30.) Nevertheless, DGS retained Mr. Kouame. When Mr. Kouame was discharged in September 2015, he was also 60. The court cannot reasonably infer that age played a substantial factor in Mr. Kouame's discharge when he was retained for a fireable offense just five months earlier.

DGS has also presented evidence that, between 2013 and 2016, it terminated six CSAs at the SeaTac terminal, not including Mr. Kouame and Mr. Ruguian, for refusing a work assignment. (Moore Decl. ¶ 23, Ex. 9.) Those employees were ages 49, 68,[6] 25, 53, 31, and 21 when they were terminated. (*Id.*) In attempting to show that DGS in fact discriminates on the basis of age, Mr. Kouame presented evidence that Ms. Cabrera (his

---

[6] The 68-year-old employee was hired in 2009 and fired in 2013. (*See* Moore Decl. ¶ 25.) Therefore, she was not near retirement eligibility when DGS terminated her employment. (*See id.* ¶ 6.)

Lead Agent) and another CSA, Florida Baluca, were not terminated for additional misconduct when they were already on a final written warning. (Resp. at 13; Wotipka Decl., Ex. 7.) Mr. Kouame's evidence, however, does not satisfy his burden.

Ms. Cabrera was on a final written warning for attendance when she had another attendance violation, while Ms. Baluca was on a final warning for not properly cleaning her area when she abused her flight privileges. (Wotipka Decl., Ex. 7 at 11-12; 21.) Unlike refusing a work assignment or leaving the work assignment without expressed authorization, attendance problems and abusing flight privileges are not listed as serious, fireable offenses. (Employee Handbook at 30.) Moreover, DGS was not compelled to fire either Ms. Cabrera or Ms. Baluca because, as Mr. Kouame recognizes, DGS does not have a progressive disciplinary policy that necessitates certain consequences for each infraction. (*See* Resp. at 13; *see also* Employee Handbook at 30.) Most importantly, however, Ms. Baluca was 67 years old and eligible for retirement benefits at the time DGS decided to not fire her even though she was on a final warning. (*See* Reply at 10; Wotipka Decl., Ex. 7 at 12.) Ms. Baluca has since retired and received DGS's travel privileges. (*See* Moore Decl. ¶ 27.) If DGS had "an unspoken, unwritten policy to wrongfully terminate employees like himself who were approaching eligibility for retirement" as Mr. Kouame claims (*see* Resp. at 14), DGS would have terminated Ms. Baluca for her additional incident. Likewise, DGS would have terminated Mr. Kouame's team member, Mr. Romero, who was 57 and eligible for the travel privileges at the time the team refused the work assignment.

//

1     Courts simply demand more than Mr. Kouame has provided in order to create a

2     genuine dispute of material fact regarding pretext.  For example, in *Lyons v. England*, the

3     plaintiff relied on statistical evidence that the employer's policies steadily removed

4     African-Americans from high-level positions, as well as testimony from a director-level

5     employee that the employer "routinely ignored departmental procedures that were

6     intended to protect workers' rights."  307 F.3d 1092, 1115-16 (9th Cir. 2002).  In

7     contrast, Mr. Kouame has presented no direct evidence and insufficient circumstantial

8     evidence that consists of a misconstrued timeline, a theory built on far-fetched conclusory

9     allegations with no factual support, statements from a co-worker that do not undermine

10    DGS's honestly believed explanation, and evidence that DGS retained a

11    retirement-eligible employee after she committed additional misconduct while she was on

12    a final warning.  Thus, although summary judgment is "seldom appropriate in the WLAD

13    cases because of the difficulty of proving a discriminatory motivation," *Scrivener*, 334

14    P.3d at 545, the court finds that summary judgment is proper here because Mr. Kouame

15    "has produced no evidence from which a reasonable jury could infer that [DGS's]

16    decision was motivated by an intent to discriminate."  *Kuyper*, 904 P.2d at 797.

17         In short, Mr. Kouame has failed to meet his burden of showing that DGS's

18    articulated reasons were pretext or, that although DGS's reasons are legitimate, age was

19    nonetheless a substantial factor in his termination.  The court therefore finds that DGS is

20    entitled to summary judgment.

21    //

22    //

# IV. CONCLUSION

For the foregoing reasons, the court GRANTS DGS's motion for summary judgment (Dkt. # 26) and DISMISSES this case with prejudice.

Dated this 22nd day of February, 2018.

JAMES L. ROBART
United States District Judge